**Opinion issued June 12, 2012.**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-11-01094-CV

————————————

## IN RE C.A.G. AND I.O.

On Appeal from the 314th District Court
Harris County, Texas
Trial Court Case No. 2010-06538J

## MEMORANDUM OPINION

In this accelerated appeal,[1] appellant, R.M.O., challenges the trial court's order, entered after a bench trial, terminating her parental rights to her two minor children. In her first issue, appellant contends that the evidence is legally and factually insufficient to support the trial court's findings that she knowingly placed

---

[1]  *See* TEX. FAM. CODE ANN. § 263.405(a) (Vernon Supp. 2011).

or allowed the children to remain in conditions or surroundings which endangered their physical or emotional well-being.[2] In her third issue, appellant contends that the evidence is legally and factually insufficient to support the trial court's finding that termination of her parental rights was in the children's best interest.[3] We affirm.

## BACKGROUND

On October 1, 2010, appellant took her almost four-year-old son, I.O., to a fire station in Houston because he was unresponsive. From there, I.O. was taken by EMS Life Flight to Childrens' Memorial Hermann Hospital. When admitted, I.O. was severely malnourished, his blood sugar levels were dangerously low, and he was in shock. I.O. was also had a body temperature of 91 and was in danger of death.

Dr. R. Girardet testified that appellant told him that I.O. was malnourished because they did not have enough money to feed him. Appellant also said that the child's father beat him daily. Dr. R. Girardet also noted loop cord marks on I.O.'s skin, scratch marks suggestive of adult fingernails, and bruises. When asked how he bruised his eye, I.O. stated that his mother hit him. He later said that both his

---

[2]     *See id*. § 161.001(1)(D) (Vernon Supp. 2011).

[3]     *See id*. § 161.001(2) (Vernon Supp. 2011).

2

parents hit him. Though almost four years old, I.O. weighed only seven kilograms, which placed him in the 50th percentile for a four-and-a-half-month-old infant.

Several days after I.O. was taken to the hospital, a social worker asked appellant if she had any other children. Appellant replied that she had an older son, C.A.G., who was a year older than I.O. When asked about C.A.G.'s size, appellant responded that he too was very small and that he looked like I.O.'s twin. C.A.G. was subsequently admitted to the hospital too. Although not in shock, he too was severely malnourished and had marks on his skin indicative of child abuse. Though five years old, C.A.G. weighed just eight and one half kilograms, which placed him in the 50th percentile for a seven-and-a-half-month-old infant. Dr. Girardet also suspected that the children might have some underlying genetic disease that was contributing to their condition.

Shortly after the children were hospitalized, appellant told hospital staff about her life prior to the children's admission to the hospital. Appellant said that she came to the United States with her parents when she was 10 years old. After her father died, her mother remarried an abusive man. Appellant said that she became pregnant with C.A.G. when she was 14 years old and later moved in with the child's father. Appellant said that she tried to leave C.A.G.'s father because he beat her and used drugs, but her mother made her stay. She finally left and went to stay with her mother, but her mother was angry at the situation and would only let

3

her feed C.A.G. one time each day.  Appellant also claimed that her mother threw C.A.G. to the ground when he was four months old and he had to be hospitalized for four days.

After this, appellant stated that she went to live for a while with her friend Martha in Beaumont.  After some time, appellant took C.A.G. and decided to find somewhere else to live.  She met a man, Juan, at a gas station who offered to help.  She declined, but took his phone number.  She later called Juan, began a relationship with him, and soon became pregnant with I.O.

Appellant and C.A.G. began living with Juan, who was very controlling.  Appellant stated that he would not let her get any prenatal care, and that I.O. was born at home.  Appellant said that she, Juan, and the children moved to San Antonio, where they lived for two years in abandoned houses and in their car under bridges.  Appellant said that she tried to leave twice, but Juan would not let her take the children.  She said that he threatened to kill the children if she tried to leave again.  According to appellant, Juan would often leave her and the children in abandoned houses and he would nail the doors and windows shut before he left.  An investigator for DFPS testified that appellant told him that they were often starving and that whenever they found food, she would eat first because she needed to be "in control."  Appellant, however, testified that whenever Juan brought food, which he did not do very often, she would feed the children first.  Appellant

4

claimed that she tried to get food stamps, but Juan became angry and tore up her passport.

Appellant said that she finally escaped when she and Juan had an argument and he got out of the car and started yelling. She said that he got scared and ran off when he saw a sheriff's car drive by. She then walked to a nearby parking lot, where she found a truck driver who was willing to take her and the children to Houston. Once there, she called her friend Martha, now in Houston, who came to pick her up. At Martha's house, appellant claimed that she fed the children and went to sleep. The next day, she noticed that I.O. was not responsive, so she and Martha drove him to the fire station for help.

Shortly after the children were admitted to the hospital, DFPS filed suit and was granted temporary managing conservatorship of both children. On December 2, 2010, the court signed "Additional Temporary Orders to Obtain Return of the Children," which required appellant, among other things, to complete a psychological examination, complete parenting classes, maintain stable housing and stable employment, and complete a domestic violence counseling program.

Appellant did not complete the requirements because she claimed that she did not have any transportation to get to them. She testified that once she obtained the necessary paperwork and got a job, she needed to save gas money for Martha, who was her only source of transportation. At times she missed her appointments

because Martha was either sick or unable to take her.  Appellant admitted that she did not attempt to learn to use public transportation, claiming that none was available where she lived.  Appellant testified that when she missed her psychiatric evaluation, she was not able to reschedule it because her friend's cell phone had been temporarily disconnected.

After a bench trial, at which Dr. Girardet, the DFPS investigator, and appellant testified and the children's medical records were admitted, the trial court rendered judgment that appellant's parental rights should be terminated based on §161.001(1)(D), (E), and (O).  However, the final judgment signed by the trial court included only §161.001(1)(D), which ordered termination based on appellant's having "knowingly placed or knowingly allowed the child[ren] to remain in conditions or surroundings which endanger[ed] the physical or emotional well-being of the child[ren.]"

## SUFFICIENCY OF THE EVIDENCE

In her first issue, appellant argues that the evidence is legally and factually insufficient to support the trial court's finding that she allowed the children to remain in conditions or surrounds that endangered their physical or emotional well-being.  *See* TEX. FAM. CODE ANN. §161.001(1)(D) (Vernon Supp. 2011).  Specifically, appellant argues that she "is compelled to admit, as she did at trial, that there is sufficient evidence to establish that the children were allowed to

remain in conditions or surroundings that endangered their physical and emotional well-being," but that she did so only under duress. In her third issue, appellant argues that the evidence is legally and factually insufficient to support the trial court's finding that termination of her parental rights was in the best interest of the children because her "failure to provide an adequate level of care for her sons was not due to indifference or malice but solely due to her misfortune and lack of resources." *See id.* § 161.001(2).

### *Standard of Review*

Because termination of parental rights "is complete, final, irrevocable and divests for all time that natural right . . . , the evidence in support of termination must be clear and convincing before a court may involuntarily terminate a parent's rights." *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985) (citing *Santosky v. Kramer*, 455 U.S. 745, 747–48, 102 S. Ct. 1388, 1391–92 (1982); *Richardson v. Green*, 677 S.W.2d 497, 500 (Tex. 1984)). Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007 (Vernon 2011); *In re J.F.C.*, 96 S.W.3d 256, 264 (Tex. 2002). Because the standard of proof is "clear and convincing," the Texas Supreme Court has held that the traditional legal and factual standards of review are inadequate. *In re J.F.C.*, 96 S.W.3d at 264–66.

7

In conducting a legal-sufficiency review in a parental-rights termination case, we must determine whether the evidence, viewed in the light most favorable to the finding, is such that the fact finder could reasonably have formed a firm belief or conviction about the truth of the matter on which DFPS bore the burden of proof. *See id.* at 266. In viewing the evidence in the light most favorable to the finding, we "must assume that the fact finder resolved disputed facts in favor of its finding if a reasonable fact finder could do so," and we "should disregard all evidence that a reasonable fact finder could have disbelieved or found to be incredible." *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (citing *In re J.F.C.*, 96 S.W.3d at 266).

In conducting a factual-sufficiency review in a parental-rights termination case, we must determine whether, considering the entire record, including evidence both supporting and contradicting the finding, a fact finder reasonably could have formed a firm conviction or belief about the truth of the matter on which the State bore the burden of proof. *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002). We should consider whether the disputed evidence is such that a reasonable fact finder could not have resolved the disputed evidence in favor of its finding. *In re J.F.C.*, 96 S.W.3d at 266–67. "If, in light of the entire record, the disputed evidence that a reasonable fact finder could not have credited in favor of the finding is so significant that a fact finder could not reasonably have formed a firm belief or

8

conviction, then the evidence is factually insufficient." *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006).

In proceedings to terminate the parent-child relationship brought under section 161.001, DFPS must establish, by clear and convincing evidence, one or more of the acts or omissions enumerated under subsection (1) of section 161.001 and that termination is in the best interest of the child. TEX. FAM. CODE ANN. §161.001. Both elements must be established, and termination may not be based solely on the best interest of the child as determined by the trier of fact. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). "Only one predicate finding under section 161.001(1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest." *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003).

### *Endangerment*

Under section 161.001(1)(D), a court may terminate the parent-child relationship if the court finds by clear and convincing evidence that the parent has knowingly placed or knowing allowed the children to remain conditions or surroundings which endanger their physical or emotional well-being. TEX. FAM. CODE ANN. § 161.001(1)(D). "Endanger" means to expose to loss or injury or to jeopardize. *Boyd*, 727 S.W.2d at 533. A child is endangered when the environment creates a potential for danger that the parent is aware of, but

9

disregards. *Jordan v. Dossey*, 325 S.W.3d 700, 721 (Tex. App.—Houston [1st Dist.] 2010, pet. denied); *In re M.R.J.M.*, 280 S.W.3d 494, 502 (Tex. App.—Fort Worth 2009, no pet.). Conduct that "subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child." *S.K.A.,* 236 S.W.3d at 901.

Subsection (D) focuses on the suitability of the children's living conditions. *In re R.D.*, 955 S.W.2d 364, 367–68 (Tex. App.—San Antonio 1997, pet. denied). Although the focus of subsection (D) is on the children's living environment and not on the parents' conduct, parental conduct may produce an endangering "environment." *See In re D.T.*, 34 S.W.3d 625, 633 (Tex. App.—Fort Worth 2000, pet. denied). We must examine the time before the child's removal to determine whether the environment itself posed a danger to the child's physical or emotional well-being. *Ybarra v. Tex. Dep't of Human Servs.*, 869 S.W.2d 574, 577 (Tex. App.—Corpus Christi 1993, no writ).

Here, appellant admitted that her children lived in abandoned houses and cars for at least two years prior to their removal from her custody. During this time, the children were underfed and became severely malnourished, and were, according to appellant, subject to daily abuse at the hands of Juan. However, there was also evidence that appellant herself hit the children. I.O. told the hospital staff that his mother caused his bruised eye.

10

Even though appellant claimed that she always fed the children first, the DFPS investigator testified that she told him that she ate first because she needed to be in control. The children's medical records show that appellant, while small, was not similarly malnourished. Likewise, she had no signs of physical abuse, even though she claimed that Juan beat both her and the children on a daily basis.

While appellant claimed that Juan abused her and the kids, locked her in abandoned houses, and refused to provide adequate food, the trial court as fact finder was entitled to disbelieve her testimony that her children's condition was all Juan's fault and that she acted only under duress. *See in re J.P.B.*, 180 S.W.3d 570, 574 (Tex. 2005) (holding that factfinder was entitled to disbelieve father's testimony that he did not know how his child was injured). This is especially true in light of other testimony tending to make appellant's testimony questionable. For example, appellant told hospital workers that when she lived with her mother, her mother would allow her to feed C.A.G. only once per day. This is extremely similar to her claim that Juan would not give them enough food to eat. Thus, the trial court could have disbelieved appellant's testimony because it seemed that she had a pattern of blaming other people for her children's malnourishment.

It was also apparent from the record that appellant did not appreciate the seriousness of her children's condition. When asked why I.O. had never been to the doctor, appellant stated that it was "because he has not ever been sick." It was

11

not until he fell into a near-comatose state that she finally realized that he needed medical attention for severe malnutrition. And, even after I.O. was admitted to the hospital, she did not seek medical attention for C.A.G. even though she was aware that he was in a similar physical condition. It was not until DFPS workers asked about other children that appellant even mentioned having a second child; much less a child in a similar malnourished condition.

Considering the evidence in the light most favorable to the trial court's ruling, we conclude that the evidence was legally sufficient to support the trial court's finding that termination was appropriate under § 161.001(1)(D). And having considered the entire record, we similarly conclude that the evidence was factually sufficient to support the trial court's finding. *See Jordan*, 325 S.W.3d 700, 724 (Tex. App.—Houston [1st Dist.] 2010, pet. denied (holding evidence sufficient to terminate under § 161.001(1)(D) when mother remained in home with physically abusive father, lived an unstable, transient lifestyle, did not attend all her mental health appointments or take prescribed medicine); *In re Z.A.S.*, No. 02–11–00040–CV, 2011 WL 3795231, at *15–16 (Tex. App.—Fort Worth Aug. 25, 2011, no pet.) (mem. op.) (holding evidence sufficient to support trial court's 161.001(1)(D) and (E) findings because evidence showed that mother, among other things, had moved frequently and had limited employment); *In re J.G.K.*, No. 02–10–00188–CV, 2011 WL 2518800, at *39–41 (Tex. App.—Fort Worth June

23, 2011, no pet.) (mem.op.) (holding evidence sufficient to support trial court's (D) and (E) findings because evidence showed that mother, among other things, failed to seek medical treatment for child, moved frequently, had limited employment, and exposed her children to domestic violence); *In re T.H.*, No. 02–07–00464–CV, 2008 WL 4831374, at *4–5 (Tex. App.—Fort Worth Nov. 6, 2008, no pet.) (mem. op.) (holding evidence sufficient to support trial court's (D) and (E) findings because evidence showed that father had engaged in conduct that subjected his children to life of instability and uncertainty, including living at more than five residences over five years; using illegal drugs; engaging in domestic violence; and exhibiting anger issues).

Having concluded that the evidence is legally and factually sufficient to support termination of appellant's parental rights under section 161.001(1)(D), we need not address appellant's issues challenging the sufficiency of the evidence under sections 161.001(1)(E) and (O). *See In re A.V.*, 113 S.W.3d at 362.

We overrule appellant's first issue.

### *Best Interest of the Children*

A trial court possesses wide discretion in determining the best interests of a child. *Villasenor v. Villasenor*, 911 S.W.2d 411, 419 (Tex. App.—San Antonio 1995, no writ). "There are several factors that should be taken into account when determining whether termination of parental rights is in the best interest of the

child." *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam). These include the statutory factors set forth in section 263.307 of the Family Code[4] that are relevant in the particular case, and the non-exhaustive list of factors described by the supreme court in *Holley v. Adams.*[5] *In re R.R.*, 209 S.W.3d at 116 (citing TEX.

---

[4] These factors include: (1) a child's age and physical and mental vulnerabilities; (2) the frequency and nature of out-of-home placements; (3) the magnitude, frequency, and circumstances of the harm to the child; (4) whether the child has been the victim of repeated harm after an initial report and intervention; (5) whether the child is afraid to return home; (6) the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home; (7) whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home; (8) whether there is a history of substance abuse by the child's family or others who have access to the child's home; (9) whether the perpetrator of the harm has been identified; (10) the willingness of the child's family to seek out, accept, and complete counseling and cooperate with supervising agencies; (11) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable time; (12) whether the child's family demonstrates adequate parenting skills, including providing the child with adequate health and nutritional care, care and nurturance consistent with the children's development, guidance and supervision for the child's safety, a safe physical home environment, protection from exposure to violence even if not directed at the child, and an understanding of the child's needs and capabilities; and (13) whether an adequate social support system consisting of an extended family and friends is available to the child.

TEX. FAM. CODE ANN. § 263.307(b) (Vernon 2011).

[5] The *Holley* factors include (1) the child's desires, (2) the current and future physical and emotional needs of the child, (3) the current and future physical danger to the child, (4) the parental abilities of the person seeking custody, (5) whether programs are available to assist the person seeking custody in promoting the best interests of the child, (6) plans for the child by the person seeking custody, (7) the stability of the home, (8) acts or omissions of the

FAM.CODE ANN. § 263.307 (Vernon 2011); *Holley*, 544 S.W.2d at 372; *In re C.R.*, 263 S.W.3d 368, 375 (Tex. App.—Dallas 2008, no pet.). The trial court may also consider any other relevant information in determining the best interest of a child. *See In re J.J.C.,* 302 S.W.3d at 447–48.

The first and third factors of section 263.307(b) focus on the children's age and physical and mental vulnerabilities, as well as the magnitude, frequency, and circumstances of harm to the children. The seventh factor of section 263.307(b) requires consideration of whether there is a history of abusive or assaultive conduct by the children's family. The second and third factors of *Holley* focus on the current and future physical and emotional needs of the children and the current and future physical danger to the children.

Here, the children are only four and five years of age. For over two years, the children were homeless, living only in abandoned houses and cars. For the same two year time period, the children were not fed properly and suffered from severe malnutrition. Both were the size of an average infant less than one year old. Their medical condition was so dire that both were still in a long-term medical rehabilitation facility at the time of trial even though they had been removed from appellant's care over a year before. There was evidence that both children would

---

parent that may indicate that the parent-child relationship is not proper, and (9) any excuse for acts or omissions of the parent. *Holley v. Adams,* 544 S.W.2d 367, 371–72 (Tex. 1976).

15

require future medical attention. The record also shows that the children were subjected to daily physical abuse, in addition to starvation. There were rope marks and bruises on their bodies. While appellant claimed that Juan was the abuser, there was also evidence that she, too, hit the children. I.O. told hospital staff that his mother caused his bruised eye.

These factors weigh in favor of finding that termination of appellant's rights is in the children's best interest.

Factors 10 and 12 of section 263.307(b) and the fourth and seventh *Holley* factors focus on the parenting abilities of the person seeking custody. Specifically, we consider appellant's willingness to seek out, accept, and complete counseling and cooperate with supervising agencies. We also consider whether she had demonstrated adequate parenting skills, "including providing the child . . . with minimally adequate health and nutritional care." TEX. FAM. CODE ANN. § 263.307(b)(12). Finally, we consider appellant's ability to provide the children with a stable home. *See id.*

Here, appellant was ordered by the court to undergo psychiatric testing, as well as parenting classes and a domestic violence class. However, appellant completed none of them. She testified that she was unable to do so because she lacked transportation, however, she never learned to use public transportation or sought to move to an area better served by public transportation. There is also no

16

evidence that she ever called anyone at the Department to let them know of her transportation woes. Instead, she just failed to show up to her classes. Thus, the trial court could have concluded that appellant had not demonstrated any willingness to seek out, accept, and complete counseling and cooperate with supervising agencies.

Clearly, appellant failed to demonstrate adequate parenting skills, including providing the children with adequate health and nutritional care. *See id.* Her four and five year old children were the size of infants when taken into the Department's custody. There was evidence that when food was available, she ate first before feeding the children. Appellant remained with an abusive boyfriend for over two years, during which her children were basically starved and beaten daily. She claimed that she tried to leave twice, but Juan would not let her take the children. However, there is no evidence that she ever called anyone for help or attempted to obtain help for the children. And, this was appellant's second abusive relationship. She also testified that C.A.G.'s father abused her when she was with him.

There was also evidence that appellant failed to comprehend the seriousness of her children's condition. She testified that she never took I.O. to the doctor—until he went into shock as a result of starvation and dehydration—because he was never sick; this despite the fact that I.O. was the size of an infant. She also did not

seek medical attention for C.A.G. after I.O. was admitted to the hospital, even though she was aware that he was in a similar physical condition. This evidence suggests that appellant was unable to recognize, much less provide, adequate health care for the children.

Regarding appellant's ability to provide a stable home, we note that at the time of trial, appellant was working, but she was still staying with her friend Martha and relying solely on Martha to provide her with a home and transportation. Although she testified that she would obtain food stamps to help feed her children, appellant had not done so during the one year that the children were in the rehabilitation facility. By appellant's continued dependence on others—first C.A.G.'s father, then Juan, then Martha—she had demonstrated an inability to take care of herself, much less two small children in need of continuing medical care.

While it is true that the Department did not present evidence of its future plans for the children, at the time of trial they were still in a long-term medical rehabilitation facility, where their physical and mental conditions had improved dramatically. The post-trial documents in this case show that the trial court was in the process of screening potential foster care parents for the children upon their eventual release from the medical facility.

After considering the relevant factors of section 263.307(b) and the *Holley* factors, we hold that the evidence is legally and factually sufficient for the trial court to reasonably form a firm belief or conviction that termination of appellant's parental rights was in the children's best interest.

We overrule appellant's third issue on appeal.

## CONCLUSION

We affirm the trial court's order terminating appellant's parental rights.


Sherry Radack
Chief Justice

Panel consists of Chief Justice Radack and Justices Jennings and Keyes.